# In the United States Court of Federal Claims

No. 16-632C (Bid Protest)

(Filed Under Seal: August 11, 2016 | Reissued: August 29, 2016)[*]

| | | |
|---|---|---|
| TETRA TECH AMT, | ) | Keywords: Post-Award Bid Protest; |
| | ) | Interpretation of Solicitation; |
| | ) | Ambiguity; Argument Raised in Reply |
| Plaintiff, | ) | Brief; Technical Evaluation. |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DELL SERVICES FEDERAL | ) | |
| GOVERNMENT, INC., | ) | |
| | ) | |
| Defendant- | ) | |
| Intervenor. | ) | |
| | ) | |

*Holly A. Roth*, Reed Smith LLP, Washington, DC, for Plaintiff, with whom were *Lawrence P. Block* and *Elizabeth G. Leavy*, Reed Smith LLP.

*Nathanael B. Yale*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Martin F. Hockey, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General. *Benjamin Klein*, Assistant General Counsel, National Science Foundation, Washington, DC, Of Counsel.

*Craig A. Holman*, Arnold & Porter LLP, Washington, DC, for Defendant-Intervenor, with whom was *Lauren J. Schlanger*, Arnold & Porter LLP. *Thomas D. McSorley* and *Emma K. Dinan*, Arnold & Porter LLP, Of Counsel.

---

[*] This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. Neither party requested redactions, and the Opinion is now being reissued in full.

**OPINION AND ORDER**

**KAPLAN, Judge.**

      This post-award bid protest arose out of a solicitation issued by the National Science Foundation (NSF) to obtain comprehensive Information Technology Customer Support (ITCS) services. Plaintiff Tetra Tech AMT (Tetra Tech), the incumbent contractor, protests the award of the contract to Intervenor Dell Services Federal Government, Inc. (Dell).

      Presently before the Court are the parties' cross-motions for judgment on the administrative record, as well as Tetra Tech's motion to amend its complaint, which it filed when briefing on the cross-motions was nearly complete. For the reasons discussed below, Tetra Tech's motion to amend its complaint and its cross-motion for judgment on the administrative record are **DENIED**, and the government's and the intervenor's cross-motions for judgment on the administrative record are **GRANTED**.

**BACKGROUND**

**I.      The Solicitation**

      NSF is an agency of the United States government that funds research and education in science and engineering through grants, contracts, and cooperative agreements. Administrative Record (AR) Tab 7C at 92. On February 3, 2015, NSF issued Request for Quotations No. DACS15Q0011 (RFQ) to obtain ITCS services for NSF's Division of Information Systems, a unit within NSF's Office of Information and Resource Management (OIRM). AR Tab 7B at 65; AR Tab 7C at 93–94, 97–98.[1]

      As described in the RFQ, the selected contractor would "respond to requests for assistance on all NSF's business applications." AR Tab 7C at 94. The RFQ's statement of work (SOW) emphasized the contractor's duty to manage an on-site, one-stop shop for ITCS services, including desktop and mobile computing support, remote access, telephones and voicemail, and business application support. AR Tab 7D at 107. The SOW stated that the purpose of the acquisition was to improve NSF's ability to: (1) maintain a customer call center without the need for referral or call-back; (2) provide training and tools to decrease customer dependence on NSF's Help Desk; and (3) determine a support model that would take into account the needs, resources, missions, and personalities of each segment of NSF's customer base.[2] Id. at 107–08.

---

[1] OIRM "provide[s] information systems, human resource management, and general administrative and logistic support functions to the NSF community of scientists, engineers, and educators, as well as the general public." AR Tab 7C at 93.

[2] Tetra Tech has been the contractor for this effort for NSF since December 1, 2003. AR Tab 24 at 529; Compl. ¶ 3, ECF No. 2.

NSF issued the RFQ under Federal Acquisition Regulation (FAR) Subpart 8.4, which provides a "simplified process for obtaining commercial supplies and services" by enabling agencies to purchase goods and services at rates that have already been negotiated with the General Services Administration (GSA). AR Tab 7A at 64; FAR 8.402(a). These negotiated rates are published on supply schedules managed by GSA. See FAR 8.402(b); Welcome to GSA Schedules, GSA.gov, http://www.gsa.gov/portal/category/100615 (last visited August 9, 2016). Thus, only contractors who had already entered contracts with GSA and whose rates appeared on GSA's Information Technology Schedule 70 were eligible to submit quotations in response to the RFQ. See AR Tab 7A at 64; AR Tab 7B at 66.

To ensure that the contractor selected would provide NSF with sufficient qualified staff to deliver the needed support services, the RFQ included a detailed "Labor Mix and Level of Effort Matrix." See AR Tab 7G at 171–92. This matrix listed labor categories selected by the agency—i.e., "Help Desk Manager" or "Business System Analyst (jr.)"—and identified the total level of effort that would be required of the employees hired for each labor category. See id. In submitting quotations, one of the prospective contractors' primary tasks was to "map" each NSF-selected labor category to an appropriate labor category found on the prospective contractor's GSA schedule. See AR Tab 7B at 84, 86–87.

Prospective contractors were instructed to submit their quotations in six volumes: (1) a written technical volume "including Key Personnel and Past Performance information;" (2) a written technical volume "describing future NSF requirements;" (3) a written technical volume "describing Business Systems Requirements Definition and System Testing;" (4) a price volume "including [Blanket Purchase Agreement (BPA)] labor categories, labor rates, and total price;" (5) a second price volume "for Task Order 1 pricing;" and (6) an "Organization Conflict of Interest Mitigation Plan." AR Tab 7B at 83. The RFQ then listed applicable page limitations for each volume, as follows:

> In addition to satisfying all conditions in the Statement of Work, a quotation shall be no more than:
>
> > Volume I – BPA and Task Order 1: 30 pages . . .
> > Volume II – Future NSF Requirements: 3 pages . . .
> > Volume III – Business Systems Requirements Definitions and System Testing: 3 pages . . .
> > Volume IV – BPA Price Volume: 10 pages
> > Volume V – Task Order I Price Volume: 10 pages . . .
> > Volume VI – Organizational Conflict of Interest Mitigation Plan – 10 pages . . . .

Id.[3] Quoters were informed that NSF would "evaluate only up to the page maximums" specified for each quote volume, and that "[a]ll material submitted beyond [the] page limits [would] not be considered during evaluation." Id. at 85.[4]

After setting out the page limits, the RFQ explained that, in proposing appropriate labor categories from their GSA schedules, quoters should "include[] only GSA labor categories and levels of effort that correspond to labor categories and levels of effort that are identified in the attached Labor Mix and Level of Effort Matrix." Id. (emphasis omitted). Quoters were warned that the agency would "deem contractor quotes as non-responsive" if their quote submissions "include[d] levels of effort estimates that are not equal to the values as identified per labor category in the Labor Mix and Level of Effort Matrix," or if their quote submissions "[did] not include GSA labor categories that correspond only to the NSF labor categories as identified in the Labor Mix and Level of Effort Matrix." Id.

The RFQ then provided detailed instructions regarding the contents of the quote volumes. These included a set of "technical instructions," which directed quoters to address four topics: Management Approach, Technical Approach, Key Personnel, and Past Performance.[5] Id. at 84–86. Among other things, a quoter's Management Approach was to specify the quoter's "process for attracting and retaining personnel." Id. at 84. In terms of Key Personnel, the RFQ directed quoters to "[i]dentify key personnel who possess knowledge, experience, leadership skills, industry recognition and certifications that demonstrate their capability of providing the skills necessary to perform requirements as outlined within the BPA and Task Order 1 Statement of Work in a similar work environment to NSF," and to "[i]nclude resumes that, at a minimum, indicate relevant experience, dates of employment, [and] employment history." Id. at 84–85 (emphasis omitted).

The RFQ then set forth the evaluation criteria NSF would use to rate the quotations. Id. at 87–88. Management Approach would be assessed for "comprehensiveness, soundness, and likelihood the contractor [would be] able to provide sufficient resources, and have proper controls in place to ensure timely and satisfactory service." Id. at 87. Technical Approach would be scored based on "the thoroughness, soundness and comprehensiveness of the contractor's quoted technical approach and

---

[3] The agency later amended the RFQ to increase several of these page limits. See AR Tab 8 at 209–10 (increasing the page limit for Volume I to 35 pages; for Volume IV to 15 pages; and for Volume V to 15 pages).

[4] The RFQ also noted that "[s]ections of each quote volume such as the cover page, table of contents, resumes and Attachment B (Past Performance Questionnaire) do not count against the page limitation." Id.

[5] Quoters were to address different aspects of some of these topics in more than one quote volume. For example, quoters were to describe different portions of their management approach in Volume I, Volume II, and Volume III. See AR Tab 7B at 84–86.

understanding of the requirements in the Statement of Work." Id. For Key Personnel, the agency would "assess the qualifications of quoted key personnel, as well as their depth and breadth of experience for performing tasks as described in the Statement of Work." Id. And for Past Performance, the agency would "determine whether the quote[r] [had] relevant high quality past performance that [would] enhance its technical capability to perform." Id.

Finally, the RFQ described the agency's source selection process. Id. at 87–88. It informed prospective contractors that the award decision would be based on a "Best Value" determination, which would be made after evaluating, in "descending order of importance," five factors: (1) Management Approach; (2) Technical Approach; (3) Key Personnel; (4) Past Performance; and (5) price. Id. at 88. The non-price factors would be considered "significantly more important than the overall quoted price." Id. Further, the agency "intend[ed] to evaluate quotes and make an award without exchanges or questions to Contractors." Id.

## II.    Initial Award and First GAO Protest

NSF received four responses to the RFQ, including quotes from Dell and Tetra Tech. See AR Tab 42 at 897. To evaluate the quotations' non-price factors, the agency convened a technical team, which considered the technical quotes and assigned an adjectival rating for each factor. See AR Tab 63. The possible ratings for the non-price factors other than past performance were as follows:

> Excellent – A comprehensive and thorough quotation with exceptional merit with many strengths. No weaknesses of significance exist.
> Very Good – A quotation which demonstrates over-all competence. One or more strengths have been found, and strengths substantially outweigh any weaknesses that exist.
> Satisfactory – A quotation which shows a reasonably sound response. There may be strengths or weaknesses, or both. As a whole, any strengths offset any weaknesses and the vendor is essentially capable of performing the requirements.
> Marginal – A quotation which has one or more weaknesses that may be significant. Any weaknesses outweigh any strengths.
> Unsatisfactory – A quotation that has one or more weaknesses that demonstrate a lack of overall competence and would require a major or complete quotation revision.

AR Tab 2 at 9. A "strength" was defined as "[a]n attribute in the quotation, which exceeds stated minimum requirements, and can be shown to provide benefit to the program or increases the probability of successful contract performance," while a "weakness" was defined as "[a]n attribute in the quotation that is a flaw and increases the risk of unsuccessful contract performance." Id

After evaluating the quotes, the technical team chairperson submitted a final technical evaluation report to the contracting officer (CO), who evaluated the price and

business quotes and made a source selection decision. <u>See</u> AR Tab 63 at 1304–33; AR Tab 64. On August 7, 2015, the CO awarded the contract to Dell. <u>See</u> AR Tab 64 at 1361.

On August 13, 2015, Tetra Tech protested NSF's award decision to the Government Accountability Office (GAO), alleging, among other things, that NSF had not evaluated the mix of labor in accordance with the FAR when reaching its decision. <u>See</u> AR Tab 24 at 525, 530–32. NSF responded by suspending the award to Dell and (as discussed in more detail below) requesting quote revisions from the interested contractors. <u>See</u> AR Tab 27 at 538. Due to this corrective action, GAO dismissed the protest on August 18, 2015. <u>Id.</u> The two quoters other than Dell and Tetra Tech then formally withdrew their quotes before the revision deadline. AR Tab 42 at 898.

## III.    NSF's Quote Revision Instructions

On October 20, 2015, NSF sent Tetra Tech and Dell emails requesting quote revisions (hereinafter referred to as the requests for quote revisions or the "RFR"). <u>See</u> AR Tabs 28–29. The RFR summarized the weaknesses in the quotations, noted the agency's concerns, and invited the quoters to submit revised quotations. <u>See</u> <u>id.</u> The emails contained identical instructions for submitting the revised quotes. <u>See</u> AR Tab 28 at 539; AR Tab 29 at 553. Specifically, NSF instructed Dell and Tetra Tech to "submit a quote revision that is consistent with all instructions and requirements as noted in RFQ #DACS15Q0011." To be "eligible for award consideration," the instructions continued, "[a]ll quote revision material must be consistent with RFQ #DACS15Q0011 instructions and requirements." AR Tab 28 at 539; AR Tab 29 at 553.

The RFR directed the quoters to "review NSF's findings" and "respond within [the] quote volumes by revising content." AR Tab 28 at 539; AR Tab 29 at 553. To "delineate revision information from previous quote submission information," the instructions specified that "[q]uote revision information (applicable for all quote volumes) must be highlighted (different font color, underline, etc.)." AR Tab 28 at 539; AR Tab 29 at 553. Further, the RFR informed Dell and Tetra Tech that they should "[i]n addition . . . respond to NSF's weaknesses, findings, or concerns . . . by indicating page numbers for where the information can be found in quote revisions." AR Tab 28 at 539; AR Tab 29 at 553.

Finally, the agency explained that it would "evaluate quote revisions using the same structure as indicated in the RFQ" and provided the following instructions for submitting their revised quotations:

Submit the following information in response to this quote revision invitation:

Volume I revision (where applicable)
Volume II revision (where applicable)
Volume III revision (where applicable)
Volume IV revision (where applicable)
Volume V revision (where applicable)
Volume VI revision (where applicable)

Respond to NSF's findings attachment by referencing quote revision page numbers (Submission will not count against the RFQ page limit).

AR Tab 28 at 539; AR Tab 29 at 553.

## IV.    Dell and Tetra Tech's Revised Quotes

On October 21, 2015, before submitting its revised quote, Dell sent the CO an email that read as follows: "Are offers still required to adhere to the same 35 page constraint as mandated in RFQ Amendment 001? To thoroughly address the concerns in the summary of finding, [Dell] respectfully request[s] additional page allocation." AR Tab 30 at 561. NSF's response stated that "[t]he RFQ page limit remains for quote resubmission." Id.

Tetra Tech also contacted NSF shortly after the RFR were sent, inquiring, "[a]re we limited to changing our total price quote in Volume IV and V as applicable to the findings in the attachment? Or may we adjust our total price quote as we deem is appropriate?" AR Tab 31 at 563. The contracting officer responded, "[a]djust your price as appropriate when considering revisions to Tetra Tech AMT's technical solution." Id. NSF did not share its answers to these questions with the other quoter—that is, it did not share its answer to Dell's question with Tetra Tech, and it did not share its answer to Tetra Tech's question with Dell. See Compl. ¶¶ 58, 98.

Dell and Tetra Tech both timely submitted revised quotes. See AR Tabs 32–33. Dell's revised quote volumes remained compliant with the page limits set forth in the RFQ (as amended). See AR Tab 32. Tetra Tech's revised quote volumes, however, exceeded the thirty-five page limit for Volume I (the revision totaled forty-seven pages, with nineteen pages submitted for Management Approach and twenty-eight pages for Technical Approach), and the three-page limit for Volume II (the revision totaled five pages). See AR Tabs 33C–E.

Accordingly, pursuant to the RFQ instructions, the CO provided the technical team with only a portion of Tetra Tech's Volume I submission, which included the entire nineteen pages of Tetra Tech's Management Approach but only the first seventeen pages of its Technical Approach (accounting for consolidation of blank parts of pages). See AR Tab 45 at 942. As with the original quotes, the technical team evaluated the quote revisions, developed findings of strengths and weaknesses, and assigned adjectival ratings for the non-price factors. See AR Tab 38.

In its evaluation of Tetra Tech's revised quote, the technical team found six strengths and two weaknesses in Tetra Tech's Management Approach, and found seven strengths and nine weaknesses in Tetra Tech's Technical Approach. AR Tab 38 at 798–804. NSF also assigned one weakness and three strengths to Tetra Tech with respect to Key Personnel. AR Tab 38 at 805. In its evaluation of Dell's revised quote, NSF found eleven strengths and six weaknesses in Dell's Management Approach, and seven strengths and one weakness in Dell's Technical Approach. AR Tab 38 at 785–96. NSF also found no strengths and identified three weaknesses for Dell with respect to Key

Personnel. <u>Id.</u> at 796. NSF noted that both Dell and Tetra Tech submitted references that were "aligned" with the SOW requirements and stated that both Dell and Tetra Tech's records of past performance indicated that "Very Good performance [could] be expected." AR Tab 38 at 798, 806.

## V.    Award Decision Following Quote Revisions

On February 18, 2016, the CO again selected Dell for the award based on a best value trade-off analysis. AR Tab 42 at 917–19. He explained that "[o]verall, both quoters were essentially equal in the first and fourth factors," and that "Tetra Tech was clearly better for the third factor." <u>Id.</u> at 918. However, he observed that "Dell's 'Satisfactory' in the second factor compared with Tetra Tech's 'Unsatisfactory' rating was a clear separation in this trade-off." <u>Id.</u> He further noted that "[c]oncerns related to labor mix were identified for both quoters, raising some risk." <u>Id.</u> In terms of price, he stated that "Dell quoted the lower priced solution and it was found to be reasonable. Tetra Tech's solution was also considered both fair and reasonable, but . . . is higher than Dell's quoted solution." <u>Id.</u> Weighing all the factors together, he selected Dell for the award because "Dell['s] quote . . . represent[ed] the overall highest technical quote" and "provided the lowest price among competing quoters," and "therefore represent[ed] the best value to the Government." <u>Id.</u> at 919.

NSF notified Tetra Tech of the award decision on February 22, 2016, and Tetra Tech requested a written explanation of the award decision that day. AR Tabs 60–61. NSF responded on February 23, 2016. AR Tab 45. In its explanation, NSF disclosed the assigned technical scores for Dell's and Tetra Tech's revised quotes and provided a summary of the strengths and weaknesses found for all five factors in Tetra Tech's revised quote submission. <u>Id.</u> at 941. NSF stated that Dell received ratings of "Very Good for Management Approach, Satisfactory for Technical Approach, Marginal for Key Personnel, and Very Good for Past Performance," and that Tetra Tech received ratings of "Very Good for Management Approach, Unsatisfactory for Technical Approach, Very Good for Key Personnel, and Very Good for Past Performance." <u>Id.</u>

NSF then explained that despite the strengths found in Tetra Tech's Technical Approach, it could not review certain functional and operational area aspects because Tetra Tech had exceeded the page limits; thus, Tetra Tech was assigned weaknesses as to those aspects. <u>Id.</u> at 945; <u>see also id.</u> at 942. In explaining its trade-off analysis, NSF reiterated that Dell and Tetra Tech received the same ratings for Management Approach, the most important factor, and for Past Performance, the fourth-most important factor. <u>Id.</u> at 946. It explained that Tetra Tech had the advantage from a Key Personnel perspective, the third-most important factor, but that—because Tetra Tech's quote exceeded the RFQ page limit for Volume I—Dell received a better rating in Technical Approach, the second-most important factor. <u>Id.</u> NSF further stated that Dell presented "the best non-price factor Technical Quote, notwithstanding Tetra Tech's better Key Personnel rating," and emphasized the fact that Dell quoted a lower price. <u>Id.</u>

## VI.     Tetra Tech's Second GAO Protest

On March 1, 2016, Tetra Tech filed a second GAO protest challenging NSF's renewed decision to award the BPA to Dell. <u>See</u> AR Tab 46. Tetra Tech claimed that certain language in the RFR had misled it into believing that any revisions to its proposal would not count against the page limits set forth in the RFQ. <u>Id.</u> at 956–59. Therefore, Tetra Tech contended, NSF's decision to exclude parts of its Technical Approach from consideration was improper. <u>Id.</u> Further, Tetra Tech argued that NSF acted unreasonably because its evaluation of both quoters' Management Approaches was "not in accordance with the terms of the RFQ." <u>Id.</u> at 960–65.

GAO denied Tetra Tech's protest on May 17, 2016. <u>See</u> AR Tab 59. According to GAO, the RFR "unambiguously conveyed . . . that quotation submissions were to comply with all instructions and requirements of the RFQ." <u>Id.</u> at 1288. Thus, it determined that Tetra Tech was "on notice that page limits remained in effect for the revised submission," and that NSF therefore "properly excluded the portions of Tetra Tech's quotation that exceeded the page limitations." <u>Id.</u> GAO further concluded that the fact that "Dell asked for relief from the page limitation . . . [did] not make the instructions any less clear, and [did] not evidence unequal treatment by the agency." <u>Id.</u> Finally, GAO determined that NSF reasonably assigned Dell a "marginal" rating for "Key Personnel" because Tetra Tech did not show that the personnel in question failed to meet the RFQ's minimum requirements. <u>Id.</u> at 1290.

## VII.    This Action

Tetra Tech filed its complaint in this Court on May 26, 2016. <u>See</u> Compl. In the complaint, Tetra Tech alleged that the instructions in the RFR were ambiguous; that it reasonably understood NSF's use of the word "submission" in the parenthetical at the end of the instructions to refer to the entire quote revision submission; and thus that it reasonably understood the RFR to waive the RFQ's page limitation requirements. Compl. ¶¶ 52, 55. Tetra Tech also alleged that Dell's inquiry regarding the page limitation supported Tetra Tech's interpretation of the RFR's language, and that NSF failed in its duty to clarify this ambiguity to all quoters after being put on notice of it through correspondence with Dell. <u>Id.</u> ¶¶ 54–55, 88–89.

In addition, Tetra Tech alleged that NSF's technical evaluations and best value determination were flawed in several ways. In particular, it alleged that the agency erred by assigning Dell a rating of "marginal" rather than "unsatisfactory" on the "Key Personnel factor." <u>Id.</u> ¶ 75. It also alleged that the agency improperly assigned Tetra Tech weaknesses based on allegedly undisclosed evaluation criteria and that it failed to apply the evaluation criteria equally to both quoters. <u>Id.</u> ¶¶ 108–10, 113–14.

Following a status conference, the Court scheduled expedited briefing on motions for judgment on the administrative record. <u>See</u> Scheduling Order, ECF No. 20. The government filed the administrative record, which Tetra Tech then moved to supplement. ECF Nos. 22–23. The Court denied Tetra Tech's motion to supplement on June 20, 2016,

ECF No. 26, and the parties subsequently filed their cross-motions for judgment on the administrative record, ECF Nos. 25, 27–28.

On July 13, 2016, Tetra Tech filed its response to the government's cross-motion for judgment on the administrative record. ECF No. 30. In it, Tetra Tech argued (for the first time) that in revising its quote, Dell improperly circumvented the RFQ's page limits by including additional substantive information in the response document in which it identified the page numbers where it made changes to its quotation. See Pl.'s Reply to Def. and Intervenor's Resp. to Pl.'s Mot. for J. on the Admin. R. and Resp. to Def. and Intervenor's Cross Mots. for J. on the Admin. R. (Pl.'s Reply) at 1–4, ECF No. 30. Two days later, Tetra Tech filed a motion to amend its complaint to add allegations conforming to the new argument it made in its reply. See ECF No. 31.

In their replies, the government and the intervenor both argued that the Court should not consider Tetra Tech's new argument because Tetra Tech failed to raise it until its reply brief; and that, in any event, the argument lacked merit. See Def.'s Reply Brief in Supp. of Def.'s Cross-Mot. for J. on the Admin R. (Def.'s Reply) at 12–15, ECF No. 34; Def.-Intervenor Dell Servs. Fed. Gov't Inc.'s Reply in Supp. of its Cross-Mot. for J. on the Admin. R. (Intervenor's Reply) at 2–6, ECF No. 35.

The Court held oral argument on July 27, 2016, during which the parties addressed their cross-motions for judgment on the administrative record and Tetra Tech's motion to amend its complaint. The motions are now ripe for decision.

## DISCUSSION

### I.      Jurisdiction

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A bidder has a direct economic interest if the alleged errors in the procurement caused it to suffer a competitive injury or prejudice. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").

In a post-award bid protest, the protestor has suffered prejudice if it would have had a "'substantial chance'" of winning the award "but for the alleged error[s] in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed.

Cir. 2006). In other words, the protestor's chance of securing the award absent the alleged errors "must not have been insubstantial." Info. Tech., 316 F.3d at 1319.

Here, Dell and Tetra Tech were the only contractors to submit revised quotations. Thus, but for the errors it alleges, Tetra Tech had a substantial chance of securing the award. Therefore, Tetra Tech has standing to pursue this action.

## II.      Standard for Granting Judgment on the Administrative Record

Pursuant to Rules of the Court of Federal Claims (RCFC) 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## III.     Standard of Review in Bid Protest Cases

The court reviews challenges to a contract award under the same standards used to evaluate an agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351. This "highly deferential" standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest action, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001). And "the protestor's burden is greater in [a] negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'" Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). Further, the court "accords contracting officers an even greater degree of discretion when the award is determined based on the best value to the agency." Glenn Defense, 720 F.3d at 908 (internal citations omitted); see also

Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013); Galen Med. Assocs., 369 F.3d at 1330; Banknote Corp. of Am., Inc. v. United States (Banknote II), 365 F.3d 1345, 1355 (Fed. Cir. 2004); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Advanced Data Concepts, 216 F.3d at 1058; E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 958–59 (Fed. Cir. 1993). In short, an agency's contract award is "least vulnerable to challenge" when it is based on a best value determination. PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 125 (2010) (citing Galen Med. Assocs., 369 F.3d at 1330).

Given this highly deferential standard of review, the court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni, 238 F.3d at 1332–33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). To prevail, the agency need only articulate a "rational connection between the facts found and the choice made;" and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (quotations omitted). Thus, the agency's action is vulnerable to challenge only if the plaintiff can show that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

## IV.   Merits

### A.   NSF's Exclusion of Pages From Tetra Tech's Revised Quotation

As described above, the RFQ (as amended) set page limits for each quote volume, specified that NSF would "evaluate only up to the page maximums . . . noted for each quote volume submission," and warned that "[a]ll material submitted beyond [the] page limits will not be considered during evaluation." AR Tab 7B at 84. The RFR, in turn, specified that any revisions submitted must be "consistent with all instructions and requirements as noted in RFQ #DACS15Q0011" to be "eligible for award consideration." AR Tab 28 at 539; AR Tab 29 at 553.

Tetra Tech does not dispute that its revised quotation was not consistent with the instructions and requirements regarding page limitations set forth in the RFQ. Tetra Tech also does not dispute that—under the terms of the original RFQ—material beyond the page limits specified therein was not to be considered during the evaluation process. As described in greater detail below, however, Tetra Tech focuses on a sentence in the RFR instructing it to "[r]espond to NSF's findings attachment by referencing quote revision page numbers," which contained a parenthetical stating that "[s]ubmission will not count against the RFQ page limit." See AR Tab 28 at 539; AR Tab 29 at 553. According to Tetra Tech, the parenthetical had the effect of waiving the page limits set forth in the RFQ for the quote volumes. See Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Admin. R. (Pl.'s Mem.) at 13–18, ECF No. 25-1. At the very least, Tetra Tech contends,

its interpretation of the relevant language was within the "zone of reasonableness," rendering the terms of the RFQ ambiguous. Pl.'s Mem. at 13 (citing Furniture by Thurston v. United States, 103 Fed. Cl. 505 (2012)). And because the terms were ambiguous, Tetra Tech argues, the agency erred because NSF had notice of the ambiguity but failed to clarify it. Id. at 19 (citing Metcalf Const. Co. v. United States, 53 Fed. Cl. 617 (2002)). These arguments lack merit.

The Court is guided in its analysis by the "well-settled principles of contract interpretation," which "apply with equal force to the interpretation of government solicitations." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 708 (2010) (citing Banknote II, 365 F.3d at 1353); see also Contract Servs. Inc. v. United States, 104 Fed. Cl. 261, 274–75 (2012); Masai Techs. Corp. v. United States, 79 Fed. Cl. 433, 443 (2007). Under those principles, the court must assess the "plain and ordinary meaning" of the solicitation's terms and then consider that meaning in the context of "the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." Banknote II, 365 F.3d at 1353; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991))).

If "more than one meaning is reasonably consistent with the [solicitation's] language," the court may conclude that the language is ambiguous. Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996); see also Universal Prot. Serv., LP v. United States, 126 Fed. Cl. 173, 185–86 (2016); Alliant Techsystems Inc. v. United States, 74 Fed. Cl. 566, 576 (2007); Unisys Corp. v. United States, 48 Fed. Cl. 451, 454 (2001). In that case, the court must determine whether the ambiguity is latent or patent. If the ambiguity is latent, then it will be construed against the government. Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999). On the other hand, where the ambiguity is a patent one, the opportunity to challenge it is waived if the offeror fails to seek clarification from the government prior to the award. Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007); see also Per Aarsleff A/S v. United States, --- F.3d ---, 2016 WL 3869790, No. 15-5111, at *6 (Fed. Cir. June 23, 2016); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012); Bannum, Inc. v. United States, 115 Fed. Cl. 257, 273–74 (2014).

With those principles in mind, the Court turns to an analysis of the relevant text from the RFR instructing Dell and Tetra Tech regarding the contents of their revised quotes. That text is as follows:

> NSF is inviting your organization to submit a quote revision that is consistent with all instructions and requirements as noted in RFQ# DACS15Q0011. All quote revision material must be consistent with RFQ# DACS15Q0011 instructions and requirements to be eligible for award consideration.

Quote revision information (applicable for all quote volumes) must be highlighted (different font color, etc.) to delineate revision information from previous quote submission information. In addition, your organization must respond to NSF's weaknesses, findings, or concerns attachment by indicating page numbers for where the information can be found in quote revisions. For example, review NSF's finding from the first attachment, and respond within quote volumes by revising content. <u>NSF is encouraging your organization to revise quotes that only address findings as noted in the first attachment.</u> NSF will evaluate quote revisions using the same structure as indicated in the RFQ.

Submit the following information in response to this quote revision invitation:

Volume I revision (where applicable)
Volume II revision (where applicable)
Volume III revision (where applicable)
Volume IV revision (where applicable)
Volume V revision (where applicable)
Volume VI revision (where applicable)
Respond to NSF's findings attachment by referencing quote revision page numbers (Submission will not count against the RFQ page limit).

AR Tab 28 at 539; AR Tab 29 at 553 (emphasis in originals).

According to Tetra Tech, notwithstanding that the revision instructions explicitly stated that all quote revision material must be consistent with all of the RFQ's instructions and requirements, and notwithstanding that those instructions and requirements included page limitations, it "reasonably understood NSF's use of the word 'submission'" in the final parenthetical in the instructions as a "refer[ence] to Tetra Tech's entire revised quote submission." Pl.'s Mem. at 14. Thus, according to Tetra Tech, it "reasonably believed NSF had waived the previous 35-page limit" for Volume I in its entirety to "permit offerors to respond in full to each of NSF's requests for information." Id.; see also Oral Argument at 17:45–50 (July 27, 2016) (stating that Tetra Tech's argument "is that the page limit has been waived").

Tetra Tech's proffered reading of the RFR language is not reasonable. First, the parenthetical upon which Tetra Tech's argument hinges appears at the end of and within the sentence that directed Dell and Tetra Tech to "[r]espond to NSF's findings attachment by referencing quote revision page numbers." Because the parenthetical is coupled with this particular item among all of the listed items that Dell and Tetra Tech were being asked to submit in connection with their revised quotes, the most logical (and only reasonable) reading of the parenthetical is that it pertains to the responsive document, and not to the other documents on the list. This conclusion is reinforced by the fact that each of the other items listed in the relevant section of the RFR has its own accompanying parenthetical. Thus, the Court agrees with GAO that "the parenthetical language at issue

unambiguously refers to the vendor's response to the agency's findings attachment, and not the entire revised quotation submission." <u>See</u> AR Tab 59 at 1287.

Further, Tetra Tech's claim that the parenthetical waived all the page limits set forth in the RFQ ignores that the parenthetical itself refers to an "RFQ page limit" against which "the submission will not count." <u>See</u> AR Tab 28 at 539; AR Tab 29 at 553. A provision stating that a submission "will not count" against the RFQ page limit presupposes that there exists such an RFQ page limit in the first instance. Yet under Tetra Tech's interpretation the parenthetical waived the very page limitations to which it refers. It is illogical to suppose that NSF would waive the RFQ's page limits in such a circuitous fashion.

Similarly unpersuasive is Tetra Tech's argument that the word "submission" in the parenthetical must include the revised quotation volumes because elsewhere in the RFQ and in the RFR the term "submission" was used to refer to all of the volumes. <u>See</u> Pl.'s Mem. at 14–15. The word "submission" is not defined in the RFQ. It is, moreover, a generic term that can only be understood in the context in which it is used. In the context in which it is used in the parenthetical at issue, the "submission" being referred to (and which will not count against the RFQ page limit) is the response document that references the quote revision page numbers.

Beyond all that, Tetra Tech's interpretation of the parenthetical's application is not consistent with the RFR and the RFQ read as a whole. As noted above, before setting forth the list that contains the key parenthetical, the revision instructions first explained that "[a]ll quote revision material must be consistent with RFQ# DACS15Q0011 instructions and requirements" and instructed the quoters to "respond to NSF's weaknesses, findings, or concerns . . . . within [the] quote volumes by revising content." <u>See</u> AR Tab 28 at 539; AR Tab 29 at 553. Then, "[i]n addition" to responding within the quote volumes, the instructions directed Dell and Tetra Tech to "respond to NSF's weaknesses, findings, or concerns attachment by indicating page numbers for where the information can be found in quote revisions." AR Tab 28 at 539; AR Tab 29 at 553. Thus, in the initial portion of the RFR, NSF directed Dell and Tetra Tech to take two actions: (1) to respond to the agency's concerns <u>within</u> the quote volumes in a manner consistent with the initial RFQ; and (2) <u>in addition</u>, to indicate the page numbers within the quote volumes where those responses would be found.

It is readily apparent that the final item on the list at the end of the revision instructions—"[r]espond to NSF's findings attachment by referencing quote revision page numbers (Submission will not count against the RFQ page limit)"—relates only to NSF's second request—i.e., the request to "in addition . . . indicat[e] page numbers for where the information can be found in quote revisions." <u>See</u> AR Tab 28 at 539; AR Tab 29 at 553. Thus, in the context of the whole RFR, the quoters could only reasonably have viewed the final parenthetical as applying to the new, separate item to be submitted, rather than as a global comment applicable to the entire revised quotation.

Despite all this, Tetra Tech asserts that a "common sense reading" of the RFR supports its interpretation because—given that NSF was requesting that additional

information be included in the revised quotations—it would not have made sense for NSF to hold Tetra Tech to the same page limitations as applied to its original submission. Pl.'s Mem. at 17 (arguing that "[a]s a practical matter, Tetra Tech would have been unable to meet the page limit requirement and respond to each of the Agency's requests for additional information within the 35-page limit as its original quote submission was 35 pages for Volume I"). The Court is not persuaded by this argument. There is no inherent conflict between instructing a party to provide additional details when submitting a revised document and also requiring it to adhere to existing page limits. The page limits imposed on offerors in a procurement are a tool used to manage the amount of information that an agency is required to review in order to make a decision, and to ensure that all offerors are on equal footing when they respond to the solicitation. In all instances, the parties must edit their submissions to comply with page limitations. And to the extent that Tetra Tech believed that it needed additional pages to address the concerns NSF had raised, it could have asked for leave to exceed the existing page limits.

The Court is also not persuaded by Tetra Tech's argument that the two-part question Dell asked NSF when preparing its revised quote establishes that the instructions were ambiguous as to whether the RFQ's page limits (as amended) were applicable to the revised quote volumes. See Pl.'s Mem. at 17–18. As described above, Dell prefaced its emailed request for permission to exceed the thirty-five-page limit set forth in the RFQ by asking whether the quoters were still required to adhere to that requirement. According to Tetra Tech, through this email Dell "sought clarification regarding the perceived ambiguity created by the language in the instructions." See id. at 17.

There are several problems with this line of argument. First, there is nothing in Dell's email that suggests that Dell had relied upon or was confused by the language in the parenthetical that Tetra Tech claims created an ambiguity as to whether the RFQ's page limitations were still applicable. It is at least equally likely that—as a predicate to requesting permission to include additional pages in its revised volumes—Dell was merely posing a rhetorical question to communicate its understanding that the original page limits did, in fact, still apply.[6]

Perhaps more importantly, even if Dell's email could be read to reflect its subjective belief that the parenthetical created an ambiguity as to the applicability of the page limitations, that subjective belief is not relevant to the issue before the Court. This Court must make its own independent assessment of the language of the RFR in determining whether Tetra Tech's proffered interpretation falls within an objective "zone of reasonableness," and it must do so irrespective of what the parties subjectively believe. Even if both parties had found the RFR ambiguous as to whether existing page limits applied, their views are not controlling. Cf. Metric Constructors, Inc., 169 F.3d at 751

---

[6] The Court notes that the in the course of  the GAO protest, the CO averred that he understood Dell's question to indicate that it believed the original page limits remained in place. See AR Tab 59 at 1251–52 ¶ 5.

(observing that "[t]o show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term").

In that regard, for the reasons set forth above, the Court concludes that Tetra Tech's reading of the language at issue is not within the zone of reasonableness. Under the plain language of the RFR, the page limits set forth in the original RFQ (as amended) were applicable to the revised quotation volumes, and the parenthetical upon which Tetra Tech relies applies only to the additional response document that Dell and Tetra Tech were required to supply. Tetra Tech's challenge to the agency's decision to exclude certain pages of its proposal from consideration must therefore fail.[7]

### B.       **Tetra Tech's New Arguments Regarding Dell's Response Document**

As described above, in its reply brief, Tetra Tech argued for the first time that Dell submitted a "non-compliant" response to the agency's revision request. See Pl.'s Reply at 1–4. According to Tetra Tech, Dell "achieved an improper work-around solution to [the] page limits" by including substantive information in its response document that was not included in its revised quote volumes.[8] Id. at 2. This new argument is unavailing.

First, it is "well established that arguments not raised in the opening brief are waived." SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006); see also Novosteel SA v. United States, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002). Tetra Tech contends, nonetheless, that the Court should entertain its new argument on the grounds that it could not have known of the existence of its new claim until after it reviewed the government's and the intervenor's cross-motions for judgment on the administrative record. See Pl.'s Reply at 1. But contrary to this assertion, the response

---

[7] In light of this conclusion, the Court does not reach the government's alternative argument—namely, that if the parenthetical gave rise to an ambiguity, such ambiguity was a patent one that Tetra Tech failed to raise before submitting its revised quote, and thus waived under Blue & Gold Fleet.

[8] In its reply, Tetra Tech also argued that Dell "failed to comply with the [revision] instructions" by failing to "mark all of its Volumes of the Quote Revisions where revisions were made." Id. at 3–4. In response, Dell pointed out that Tetra Tech was merely unable to see the places where it had made color highlights because it reviewed the black-and-white version of Dell's revised quote found in the administrative record, rather than the color version submitted to the agency. See Intervenor's Reply at 5–6. Undeterred, Tetra Tech continued to press its position at oral argument, contending that even in the full-color version, Dell highlighted only some of the changes it made. See Oral Argument at [cite]. Upon review, the Court concludes that Dell's failure to highlight a few of the more than one hundred changes to its labor category mappings constitutes, at most, de minimis error on Dell's part. See Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 630 (2014) ("[D]e minimis errors in the procurement process do not justify relief.").

document Dell filed was included in the record reviewed by GAO during the second protest, and Tetra Tech thus first had the opportunity to review it months ago.

Nevertheless, at oral argument Tetra Tech stated that it believed that "NSF hadn't looked at" Dell's response document because "the RFQ . . . says that the government will only evaluate what's contained in the proposals." Oral Argument at 20:44–48, 21:10–19; see also id. at 22:08–20 (contending that "the [RFR] instructions to the quote volumes say quite plainly that the contractor is supposed to put their responses . . . in the quote volumes"). As thoroughly discussed above, however, the RFR instructed the quoters to submit revised quote volumes and, separately, to "[r]espond to [the] findings attachment by referencing quote revision page numbers." AR Tab 28 at 539; AR Tab 29 at 553. Indeed, Tetra Tech's own revised quotation included a "Quote Reference Sheet" that identified the page numbers containing its revisions. See AR Tab 33B at 676–77. Thus, if Tetra Tech believed that the agency did not review the very document that it asked the quoters to include with their revised quotations, that belief was, at best, unreasonable. Accordingly, Tetra Tech's new argument has been waived.

Further, Tetra Tech's new argument lacks merit in any event. Contrary to Tetra Tech's claims, Dell did not evade the RFQ's page limits by padding its response document with information not found in its revised quotation. Rather, a close examination shows that much of Dell's response document consists of a repetition of the government's comments and a verbatim recitation of the changes contained in Dell's revised quotation volumes. See, e.g., AR Tab 7C at 573; AR Tab 7D at 603. Further, the tables included in Dell's response document listing the changes Dell made to its labor category mappings, see AR Tab 7C at 577–87, do not provide any information that the agency could not have gleaned from Dell's revised quote volumes alone by comparing them with Dell's initial quote and its GSA schedule. Thus, Dell's response document did not "achieve[] an improper work-around solution" to the RFQ's page limits, as Tetra Tech contends. See Pl.'s Reply at 2.

Finally, for similar reasons, the Court denies Tetra Tech's eleventh-hour motion to amend its complaint. Under RCFC 15(a)(2), though the court should freely grant leave to amend, it should not permit amendment if (among other things) the amendment "would cause the opposing party undue prejudice" or "would be futile." King v. United States, 119 Fed. Cl. 51, 54 (2014) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). And "[w]here the party seeking an untimely amendment knows or should have known of the facts upon which the proposed amendment is based, but fails to assert them in a timely fashion, the amendment will be denied." Id. (quoting In re Ameritech Corp., 188 F.R.D. 280, 284 (N.D. Ill. 1999)).

As discussed above, Tetra Tech knew or should have known of the purported flaws in Dell's response document months ago. Nonetheless, it did not raise its claims until it filed its final brief on the cross-motions for judgment on the administrative record. Moreover, and in any event, amendment would be futile in light of the Court's conclusion that Dell's response document did not violate the revised instructions. Accordingly, Tetra Tech's motion to amend its complaint is **DENIED**.

C.      **NSF's Technical Evaluations**

Finally, Tetra Tech challenges several aspects of the agency's technical evaluation of the two revised quotes. "[T]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." One Largo Metro, LLC v. United States, 109 Fed. Cl. 39, 74 (2013) (quoting Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005)); see also E.W. Bliss Co., 77 F.3d at 449 ("[M]atters [such] as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.").

Further, to demonstrate the proper exercise of discretion, the agency need only "document[] its final award decision and include[] the rationale for any business judgments and tradeoffs made." Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (quoting FAR 15.308). Thus, the court reviews the agency's reasoning only to "ensure that the contracting officer examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" Banknote Corp. of Am., Inc. v. United States (Banknote I), 56 Fed. Cl. 377, 390 (2003) (quoting State Farm, 463 U.S. at 43)).

1.      **NSF's Evaluation of Tetra Tech's Management Approach**

Tetra Tech first argues that the agency erred by assigning three weaknesses to its Management Approach based on applying what it characterizes as "unstated" evaluation criteria. See Pl.'s Mem. at 23–27. Specifically, it contends that NSF assigned it one weakness after finding that, as a consequence of the stringent minimum experience levels required of mid-level employees under Tetra Tech's proposal, junior-level employees might not be eligible to receive timely promotions, which could lead to attrition. Id. at 23–25 (citing AR Tab 38 at 800–01). Further, it argues that NSF assigned it two more weaknesses for selecting GSA labor categories for certain important personnel positions that, in NSF's view, had insufficient minimum experience requirements to ensure that the employees hired for those positions would be able to meet NSF's needs. Id. at 26–27 (citing AR Tab 38 at 801).

As the government points out, however, agencies have "great discretion in determining the scope of an evaluation factor." Def.'s Resp. to Pl.'s Mot. for J. on the Admin. R. and Def.'s Cross Mot. for J. on the Admin. R. (Def.'s Resp.) at 27 (quoting NEQ, LLC v. United States, 88 Fed. Cl. 38, 48 (2009)). And the RFQ's stated evaluation criteria are more than broad enough to encompass the agency's assessments regarding these aspects of Tetra Tech's quotation. Specifically, the RFQ informed the quoters that the agency would evaluate the Management Approach to determine "the likelihood [that] the contractor [will be] able to provide sufficient resources, and have proper controls in place to ensure timely and satisfactory service," AR Tab 7B at 87, and required that the Management Approach explain "the Contractor's process for attracting and retaining personnel," id. at 84. There is a clear connection between these evaluation criteria and the agency's concerns about the promotional limitations and personnel deficiencies

embedded in Tetra Tech's proposed Management Approach. Thus, the agency properly exercised its discretion in assigning the three weaknesses to Tetra Tech's Management Approach.

### 2.    NSF's Evaluation of Dell's Key Personnel

Next, Tetra Tech contends that NSF should have assigned Dell an "unsatisfactory" rating for "key personnel," rather than a "marginal" rating, because the agency determined that three out of six key personnel proposed by Dell were "sub-par." Pl.'s Mem. at 28–30. This argument also lacks any merit. As described above, a "marginal" rating meant that the quotation "ha[d] one or more weaknesses that may be significant. Any weaknesses outweigh any strengths." AR Tab 2 at 9. An "unsatisfactory" rating, meanwhile, would be appropriate if the quotation "ha[d] one or more weaknesses that demonstrate[d] a lack of overall competence and would require a major or complete quotation revision." Id.

In assessing Dell's revised quote, the technical evaluation team spotted the deficiencies in Dell's proposed key personnel and explained that the quotation deserved a "marginal" rating because "the weaknesses were considered significant" and "present[ed] a substantial risk to the overall success of the BPA/Task Order." AR Tab 38 at 796. Thus, whether or not the agency could reasonably have assigned Dell's quotation an "unsatisfactory" rating for Key Personnel (about which the Court expresses no opinion), there is no question that in assigning the "marginal" rating, NSF "examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" See Banknote I, 56 Fed. Cl. at 390 (quoting State Farm, 463 U.S. at 43)). In short, Tetra Tech's challenge amounts to a bare invitation to have the Court to reweigh issues that were properly addressed by the agency in the first instance. It therefore must be rejected.

### 3.    NSF's Best Value Determination

Finally, Tetra Tech disputes the propriety of the agency's best value determination. As with technical evaluations, "[p]rocurement officials . . . have substantial discretion to determine which proposal represents the best value for the government." Glenn Defense, 720 F.3d at 908 (quoting E.W. Bliss Co., 77 F.3d at 449). Thus, "[w]here agency officials reasonably and properly exercise their discretion when conducting a best value analysis, the Court will not disturb an agency award." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009) (citing E.W. Bliss Co., 77 F.3d at 449).

According to Tetra Tech, the CO erred in the best value determination by giving undue weight to the "unsatisfactory" rating assigned to its Technical Approach. See Pl.'s Mem. at 30–32. Tetra Tech correctly points out that, as specified in the RFQ, the agency was to evaluate the four non-price factors—Management Approach, Technical Approach, Key Personnel, and Past Performance—in descending order of importance. See AR Tab 7B at 88. Tetra Tech's claim of error, however, lacks merit. Specifically, it argues that the agency "ignored the weight [that should have been] attributed to Tetra Tech's 'Very

Good' ratings on three of the four technical evaluation factors," and at the same time "ignored Dell's 'Satisfactory' rating on the second-most important technical factor . . . and its 'Marginal' rating on the third-most important factor." Pl.'s Mem. at 31–32.

The CO's source selection decision does not bear out these critiques. Rather, after discussing the reasons behind each quoter's rating for each factor, the CO noted that "both quoters were essentially equal in the first and fourth factors," and that "Tetra Tech was clearly better for the third factor." AR Tab 42 at 918. Critically, however, he determined that "Dell's 'Satisfactory' in the second factor compared with Tetra Tech's 'Unsatisfactory'" marked a "clear separation in this trade-off." Id.

Given that technical approach was considered more important than key personnel, the CO's trade-off decision would have been a reasonable one even if there was less of a discrepancy between the quoters' technical approaches. More to the point, though, the CO was entitled to consider not just the weight assigned to each factor by the RFQ, but also the degree to which the underlying reasons for the adjectival ratings impacted the comparative qualities of the quotations. See Braseth Trucking, LLC v. United States, 124 Fed. Cl. 498, 508 (2015) (noting that the CO may "properly 'look beneath' the rating[s] to understand why the offeror was given the rating[s] and, more importantly, to assess how those reasons might affect the offeror's performance of the contract" (citation omitted)). Thus, the CO did not err by considering the gravity of the flaws in Tetra Tech's technical approach when conducting the best value determination.

## CONCLUSION

For the reasons discussed above, Tetra Tech's motion for judgment on the administrative record is **DENIED**, and the government's and the intervenor's cross-motions for judgment on the administrative record are **GRANTED**. Tetra Tech's motion to amend its complaint is also **DENIED**. The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge